IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

UNITED STATES OF AMERICA,            )
                                     )
        Plaintiff,                   )
                                     )
vs.                                  )        No. 13-20004-STA-dkv
                                     )
MICHAEL STEPHENS,                    )
                                     )
        Defendant.                   )

_____

REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

_____

The defendant, Michael Stephens ("Stephens"), has been indicted on one count of conspiracy to possess with the intent to distribute cocaine and one count of attempt to possess with the intent to distribute cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1). These charges arise out of an undercover operation by the Memphis Police Department's Organized Crime Unit ("OCU") on July 28, 2012, involving the purchase of five kilograms of cocaine by a male Hispanic. The operation included a reverse drug sale, in which an undercover officer posed as a seller of five kilograms of cocaine to a willing buyer and which led to the arrest of Ramon Soto, Julio Juarez, Carlos Hart, and Stephens. Stephens has moved to suppress evidence obtained from the search of his cell phone as the fruit of an illegal investigatory stop, an illegal search of his vehicle, and an

illegal search of his phone in violation of the Fourth Amendment. (D.E. 83-1.) The government timely filed a response in opposition. (D.E. 84.) The motion was referred to the United States Magistrate Judge for a report and recommendation.

The court held an evidentiary hearing on August 27, 2013. At the hearing, the government called three witnesses from the Memphis OCU: Detective Mario McNeal; Detective Therman Richardson; and Detective Tony Parks. The government also introduced into evidence a Google Earth image of the Dicks Sporting Goods, Costco, and Microtel Hotel parking lots on North Germantown Parkway in Memphis, Tennessee, where the events of July 28, 2012 took place. After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibits, and the entire record in this case, this court submits the following findings of fact and conclusions of law and recommends that the motion to suppress be granted as to the search of the cell phone.

## I. PROPOSED FINDINGS OF FACT

On July 26, 2012, officers with the OCU received information from a confidential informant ("CI") that a Hispanic male named "Isaias" was looking to purchase five kilograms of cocaine. The following day, the CI exchanged recorded phone calls with Isaias, discussing Isaias's desire to obtain five kilograms of cocaine. The phone number used to contact Isaias

was registered to Isaias Soto. On July 28, 2012, undercover officer Detective Harold Tellez placed a recorded phone call to the same number, but the phone was answered by a different Hispanic male named Ramon Soto ("Soto"). Soto stated that Isaias was a cousin and that he in fact had the money for the cocaine deal. Soto and Detective Tellez arranged for a "flash" of one kilogram of cocaine at the Dick's Sporting Goods parking lot at 2393 North Germantown Parkway so that Soto could review a sample. Soto would thereafter bring the money for five kilograms of cocaine if he approved of the cocaine.

Detective Tellez arrived to meet Soto at the Dick's Sporting Goods parking lot with the requested one kilogram of cocaine at approximately 2:32 P.M. on July 28, 2012 ("the first meeting"). Detective McNeal sat in a nearby vehicle for surveillance, counter-surveillance, and safety purposes. Detective McNeal observed Soto and another male Hispanic arrive in a silver Malibu and approach Detective Tellez's undercover vehicle. After Soto viewed the cocaine and approved it, Detective Tellez and Soto agreed to exchange the full five kilograms at a specified price later that day in the same location. Further recorded phone conversations confirmed these details.

At 3:14 P.M. on the same day, a second meeting occurred at the same Dick's Sporting Goods parking lot ("the second

meeting") — this time so that Soto could "flash" the money for the drug deal to the CI. Detective Tellez was not present at this meeting; he was already stationed at the Microtel parking lot behind Costco, located at 2423 North Germantown Parkway, where the final exchange of drugs and money was to occur. At the second meeting, the CI occupied a tan van, and Detective McNeal remained on surveillance. He observed two vehicles approach the CI's van. Soto drove the first vehicle, a red GMC truck. There were two other passengers in the red truck who were later identified as Julio Juarez ("Juarez") and Carlos Hart ("Hart"). The second vehicle, a black 2012 Chrysler 200, followed the red truck as they first circled the parking lot. The black Chrysler was driven by a black man with dreadlocks, later identified as Stephens.

Stephens had not been a subject of the investigation prior to his arrival on the scene, and Detective McLean testified that he initially believed the Chrysler was driven by a black female because of Stephens's long dreadlocks. Detective McNeal further testified that the occupant of the Chrysler raised his suspicion immediately because, based on his eleven years of police experience, it is common to have another person act as counter-surveillance during a drug transaction. He stated that the parking lot was large, and it was apparent that the Chrysler was tracking the red truck based on their unusual movements

throughout the lot.  Detective McNeal radioed other officers to alert them that another suspect had entered the scene.

When the two cars arrived, the red truck pulled alongside the CI's tan van for the money count, and the black Chrysler driven by Stephens pulled aside and parked in two parking places.  Detective McNeal testified that Stephens parked his vehicle where he could view the money count and that the odd positioning of Stephens's car in two spaces again raised his suspicion that Stephens was not there to shop at Dick's Sporting Goods.  Stephens adjusted his seat slightly backwards and watched the scene.  He never left his vehicle to enter the store during the five to ten minutes that the money count took place. Meanwhile, the driver of the red truck — Soto — exited his truck, showed the CI the money for the deal, and got inside the CI's van.  One of the passengers of the truck, Juarez, moved over into the driver's seat.  When the money count was complete, Soto called Detective Tellez to inform him the cash was ready for the deal.  The tan van, occupied by the CI and Soto, then drove to the Microtel parking lot behind Costco for a third meeting to complete the deal ("the third meeting"), followed by the red truck occupied by Juarez and Hart.  Detective McNeal confirmed with another officer over the radio that he should drive toward the hotel parking lot and that another officer would keep track of Stephens.

As Detective McNeal drove to the hotel parking lot, which was accessible through the parking lot of Costco, he again came upon Stephens at a four-way stop in the Costco parking lot. Directly opposite of Detective McNeal at the stop, Stephens turned toward the Microtel lot and followed the red truck and van to that location. Detective McNeal pulled behind Stephens and drove in the same direction. When Stephens arrived on the hotel parking lot behind Costco where the transaction took place, he stopped his car under an awning for what Detective McNeal estimated was about thirty seconds to a minute and watched the exchange of drugs. The police then arrived on the scene for the takedown, and Stephens attempted to pull away. Detective McNeal and another police officer blocked his vehicle and approached Stephens.

When Detective McNeal reached Stephens's vehicle, Stephens remained seated in the vehicle and rolled the window down. Immediately, Detective McNeal smelled a strong odor of marijuana and saw a large amount of cash in plain view on Stephens's console. Detective McNeal testified that he smelled what he recognized from his eleven years of police experience to be a large quantity of high grade marijuana in raw form. The smell was so strong, Detective McNeal testified, that it led him to believe that either there was marijuana in the vehicle or it had just left the vehicle. At this time, Detectives Richardson and

Parker ran over from the takedown of Soto, Juarez, and Hart to assist Detective McNeal in dealing with Stephens. They likewise testified that the smell of marijuana was pungent and that a great deal of cash was visible on the console.[1]

The officers then had Stephens step out of the vehicle and performed a pat down. Detective Richardson began to question Stephens as Detectives McNeal and Parker performed a search of the black Chrysler. Detective Richardson asked Stephens whether he knew the Hispanic men, and Stephens replied that he did not. Detective Parker also testified that he heard Stephens claim that the reason he had stopped at the hotel was to wait for a woman to come out of the hotel. However, no woman ever arrived. After Stephens denied association with the Hispanic men, Detective Richardson took Stephens's cell phone, which Stephens identified as his own. Detective Richardson scrolled through Stephens's contact list and saw that Carlos Hart — the Hispanic

---

[1]     Detective Richardson's testimony about the nature of the marijuana odor differed from Detective McNeal's testimony in that he could not recall whether it smelled raw or smoked — only that it was very strong. He stated that he was very familiar with the smell of marijuana based on his sixteen years of police experience, but that the difference between high and low grade marijuana is difficult to determine by smell alone. However, on this difference of opinion, the court finds no real dispute between the witnesses' testimony. Both Detectives McNeal and Richardson have a great deal of experience in the Memphis OCU and testified that they have smelled the odor of marijuana at least two hundred times. Whether the smell indicated marijuana in its raw, smoked, low grade, or high grade form is of little consequence in light of their agreement that the smell of marijuana in Stephens's car was very strong.

man who rode as a passenger in the red truck — was listed. He stated that he did not look to see whether any calls were made back and forth between the suspects on the call log, but only viewed the contact list. He could not recall whether a pass code was required to gain entry into the phone, nor could he recall how he accessed the contact list. When asked for what purpose he searched Stephens's phone, Detective Richardson replied that his purpose was to either confirm or disprove Stephens's statement that Stephens did not know the Hispanic men. Detective Richardson testified that at the time Stephens stated he did not know the Hispanic men involved in the drug transaction, Stephens "was detained and not arrested and was not Mirandized." Detective Richardson testified that the search of Stephens's phone took place about two minutes after Detective Richardson reached Stephens's car.

No marijuana or other contraband was found during the search of Stephens's vehicle. Both Detectives McNeal and Parker testified that they were surprised that they did not find any marijuana based on the strong smell. The money on Stephens's console amounted to $9,535, and an additional $220 was found on his person. Stephens, Juarez, and Hart were then transported to the OCU station for further investigation. Stephens was advised of his *Miranda* rights at the station and questioned by Detective Parks, but Stephens declined to give a statement. Further

investigation revealed that Stephens and Hart had purchased cocaine from Soto in the past.

At the hearing, the government introduced as an exhibit a Google Earth image of the Dick's Sporting Goods, Costco, and Microtel parking lots on Germantown parkway. Detective McNeal indicated the movements of the red truck and the black Chrysler through the large inter-connected parking lots, and Detectives Richardson and Parker testified to where the takedown of the drug deal and the stop of Stephens took place.

The defendant did not call any witnesses or introduce any exhibits. On cross-examination of Detective McNeal, however, much inquiry was made into the basis of his suspicion regarding Stephens. Detective McNeal testified that Stephens placed himself in the investigation by following the red truck to both the second and third meetings. This raised his suspicion because "every movement that red truck made, that Chrysler made." Further, Stephens's behavior in sitting in his vehicle and watching the transaction take place alerted Detective McNeal that Stephens was not a patron of Dick's Sporting Goods but was acting as counter-surveillance for the Hispanic men. When asked whether Stephens ever did anything illegal, exited his vehicle, approached the Hispanics or the CI, or talked on his cell phone, Detective McNeal replied that Stephens did not. Detective McNeal also testified that he would have questioned Stephens in

the hotel parking lot even if he had not smelled marijuana because of Stephens's behavior in following the red truck. As to the money on Stephens's console, Detective McNeal agreed that it could not have been acquired from the witnessed drug transaction. Detective McNeal also testified that once Stephens was stopped on the scene, he was not free to go; he was detained as part of the drug operation.

On cross-examination of Detectives Richardson and Parker, defense counsel again inquired into the basis of the stop of Stephens. They both testified that they were not present at the second meeting on July 28, 2012, where Stephens followed the red truck onto the Dick's Sporting Goods parking lot. They participated in the questioning and search of Stephens's vehicle and phone based on Detective McNeal's suspicion that Stephens was acting as counter-surveillance for the Hispanic men, which he had communicated over the radio. Additionally, their suspicion was raised by the strong odor of marijuana and the large sum of cash on Stephens's console. When asked on cross-examination whether Stephens would have been arrested even without the cell phone contact information, Detective Richardson answered that he was not the case agent. Only the case agent makes the determination of who should be arrested, but he believed the smell of marijuana, the money, and the behavior of Stephens in following the red truck likely contributed.

Finally, on re-direct, Detective Richardson agreed that he had seen many cases in his sixteen years of police service where Hispanics were accompanied by black men or women to exchange cocaine because it is rare that a black person can acquire five kilograms of cocaine without a Spanish speaker.

The court finds that the testimony of the three OCU detectives was credible and not in conflict with one another. The sequence of events that occurred at each of the three meetings on July 28, 2012, was confirmed by each of the detectives, and all testified similarly about the strong smell of marijuana present in Stephens's vehicle, the large amount of visible cash on Stephens's console, and the way that the search of Stephens's vehicle and phone was undertaken.

## II. PROPOSED CONCLUSIONS OF LAW

Stephens objects on Fourth Amendments grounds to his investigatory stop, the search of his car, and the search of his phone. He seeks to suppress the cash found in his vehicle and the evidence of Hart's contact information obtained from the search of his cell phone. Specifically, Stephens argues (1) that his stop was without reasonable suspicion or probable cause; (2) that the search of his car was not supported by probable cause;[2] and (3) that the search of his cell phone was an

---

[2] Though Stephens did not make this argument in his memorandum in support of his motion to suppress, (D.E. 83-1), he

illegal search and seizure that required a warrant. In opposition, the government argues (1) that the stop was supported by reasonable suspicion and probable cause based on the behavior of Stephens in following the other defendants' cars and watching the drug transaction; (2) that the search of Stephens's car was supported by probable cause based on the plain smell of marijuana and the large amount of cash on the console; and (3) that the search of Stephens's phone was justified in light of the limited intrusion into only the contact list, the similarity of a contact list to an address book, and the expediency of the search.

A.    The Initial Stop of Stephens

Investigatory stops, in which the police briefly seize a person, are governed by the Fourth Amendment and are lawful when supported by reasonable suspicion — a standard less than probable cause. *See Terry v. Ohio*, 392 U.S. 1, 20-21 (1968). Reasonable suspicion exists when the investigating officer can "point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Id.* at 21. In making this determination, courts look to the totality of the circumstances, considering "all of the information available to law enforcement officials

---

raised it in oral argument at the hearing on August 27, 2013. Thus, this court addresses it in its report and recommendation.

at the time." *Feathers v. Aey*, 319 F.3d 843, 848-49 (6th Cir. 2003); *see U.S. v. Arvizu*, 534 U.S. 266, 275-77 (2002). The Supreme Court in *Terry v. Ohio* also emphasized that the need to search or seize must be balanced "'against the invasion which the search (or seizure) entails.'" *Id.* (quoting *Camara v. Mun. Court of S.F.*, 387 U.S. 523, 534 (1967)).

In view of the totality of the circumstances in the present case, Detective McNeal's stop of Stephens was properly based on reasonable suspicion.[3] Detective McNeal provided specific and articulable facts about Stephens's behavior that reasonably raised his suspicion on July 28, 2012. When Stephens drove onto the Dick's Sporting Goods parking lot at the second meeting, his movements tracked the movements of Soto's red truck. The

---

[3] Notably, there was some discrepancy in the parties' view of whether the reasonable suspicion or probable cause standard applies to the initial stop of Stephens. The government analyzed the stop of Stephens under the higher probable cause standard in its memorandum in opposition to the motion to suppress by relying on Sixth Circuit precedent that differentiates the standard to be used when an investigatory stop is based on an ongoing versus a completed misdemeanor traffic violation. (D.E. 84 at 4-5.) It argued that the stop of Stephens satisfies both probable cause and reasonable suspicion. (*Id.*) Stephens, on the other hand, analyzed the initial stop under the reasonable suspicion standard outlined in *Terry*, (D.E. 83-1 at 4), as this court does in this report and recommendation. Given that Stephens's stop by Detective McLean was not based on a traffic infraction but rather on Stephens's behavior at the second and third meetings of the drug transaction as potential counter-surveillance for the drug deal, the court finds that the all that is required to make the initial stop of Stephens is reasonable suspicion. Indeed, none of the evidence or testimony suggests that Stephens committed a traffic violation.

parking lots were large, and the movements of the vehicles were unusual. He testified that Stephens parked so that he could view the money count and that Stephens made himself comfortable by adjusting the chair. Stephens never left the vehicle, and he parked in two parking spots, indicating he was not there as a customer of Dick's Sporting Goods. Further, when the red truck and the tan van drove in the direction of the hotel parking lot where the drug transaction took place, Stephens drove to the same location and again stopped in a place where he could view the scene. Stephens attempted to leave when the police arrived.

Detective McNeal made a rational inference from these facts and from the information available to him at the time. He testified that based on his eleven years of experience in the police force, it is common at a drug deal for someone to act as counter-surveillance, and Stephens's behavior aligned with that activity. All of these specific facts and inferences support a finding that law enforcement had reasonable suspicion to believe Stephens was associated with the drug transaction. This reasonable suspicion justified the stop of Stephens for investigatory purposes.

B.    The Search of Stephens's Car

Stephens next challenges the search of his vehicle. As a general matter, the Fourth Amendment does not require a warrant to search a vehicle if law enforcement has probable cause to

believe it contains contraband or evidence of criminal activity. *See Carroll v. United States*, 267 U.S. 132, 160-62 (1925)(holding warrantless automobile search valid because the police had probable cause to believe it contained contraband based on the occupants' offer to sell liquor to federal agents); *see also United States v. Ross*, 456 U.S. 798, 808-09 (1982)(recognizing the *Caroll* warrantless automobile exception as valid and discussing its scope); *United States v. Smith*, 510 F.3d 641, 648 (6th Cir. 2007)(upholding a warrantless automobile search because police had probable cause based on investigation to believe that it was used to transport and deal drugs). The Sixth Circuit has consistently held that the odor of marijuana or other narcotics coming from inside a vehicle is sufficient to provide probable cause to conduct a lawful search of a vehicle. *United States v. Foster*, 376 F.3d 577, 588 (6th Cir. 2004)(holding that the officer's smell of marijuana coming from the vehicle gave them probable cause to search without a warrant and "turned a lawful Terry stop into a lawful search"); *United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002)("This court has held that an officer's detection of the smell of marijuana in an automobile can by itself establish probable cause for a search.").

In this case, Detectives McNeal, Richardson, and Parker all smelled a strong odor of marijuana coming from Stephens's

vehicle.  They testified extensively that the smell was pungent
and immediately apparent, and Detectives McNeal and Richardson
both noted that they recognize the smell of marijuana having
smelled it at least two hundred times in the course of their
work.  They also saw a large sum of cash in plain view on the
console.  These facts provided them with probable cause to
search of Stephens's vehicle without a warrant.

C.    The Search of Stephens's Phone

The most difficult question before the court is the
lawfulness of the search of Stephens's phone by scrolling
through his contact list.  As noted by the government at the
suppression hearing, no Sixth Circuit case speaks to the issue
of warrantless searches of a cell phone.  However, at least two
district courts within the circuit have upheld the search of a
cell phone incident to an arrest.  *See United States v. Martin*,
No. 07-20605, 2012 WL 6764800, at *6-7 (E.D. Mich. Nov. 9,
2012); *United States v. Slaton*, No. 5:11-131, 2012 WL 2374241,
at *8 (E.D. Ky. June 22, 2012).

1.    *Searches Incident to an Arrest Versus Investigatory
Stop Searches*

As a preliminary matter, whether the search of Stephens's
cell phone was made incident to his arrest or as part of his
investigatory stop bears on the validity of the search.  In
order to support a search incident to an arrest, the underlying

arrest must be lawful. *See United States v. Robinson*, 414 U.S. 215, 235 (1973). A police officer may make a warrantless arrest in limited circumstances. One justification is when the officer has probable cause to believe the arrestee has committed a felony and the arrest occurs in a public place. *See United States v. Watson*, 423 U.S. 411, 417-24 (1976); *United States v. Abdi*, 463 F.3d 547, 557 (6th Cir. 2006)("[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where the arrest is in public and there is probable cause to believe that a criminal offense has been or is being committed."). To determine whether probable cause to arrest exists, "we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)(quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). The Supreme Court has stated that the probable cause standard is "'incapable of precise definition," but that "[t]he substance of all the definitions . . . is a reasonable ground for belief of guilt, . . . and that belief of guilt must be particularized with respect to the person to be searched or seized.'" *Id.* (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)).

Once probable cause to support a warrantless arrest is established, police can conduct a search incident to that

arrest.  *See Robinson*, 414 U.S. at 235.  This includes a search of the arrestee's person for weapons and evidence, as well as a search of containers and other items found on the person or within his or her immediate control.  *See id.*; *United States v. Kaye*, 492 F.2d 744, 746 (6th Cir. 1974)(upholding search of defendant's suitcase after custodial arrest despite no need to disarm the defendant or prevent the destruction of evidence because the search was reasonable and incident to his arrest).  If the probable cause to arrest arises from a warrantless search, however, the search cannot be justified as a search incident to an arrest.  *See Smith v. Ohio*, 494 U.S. 541, 542-43 (1990)(per curiam)("'It is axiomatic that an incident [to arrest] search may not precede an arrest and serve as part of its justification.'" (quoting *Sibron v. New York*, 392 U.S. 40, 63 (1968))).

Searches conducted pursuant to an investigatory stop are more limited in scope than searches incident to an arrest.  Under *Terry*, law enforcement may conduct a limited pat-down frisk of a suspect's clothing based on the reasonable belief that the person poses a threat to the safety of the officer or others.  *Terry*, 392 U.S. at 27-28, 30; *see also Ybarra*, 444 U.S. at 92-93.  In an investigatory stop, the police can also search without a warrant or probable cause if the individual

voluntarily consents to the search. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).

2. *Review of Case Law Regarding the Search of a Cell Phone Incident to an Arrest or Pursuant to a* Terry *Stop*

The majority of cases dealing with the search of a cell phone involve a search incident to an arrest, rather than a search pursuant to a *Terry* stop. *See, e.g.*, *United States v. Flores-Lopez*, 670 F.3d 803, 804 (7th Cir. 2012); *United States v. Murphy*, 552 F.3d 405, 410 (4th Cir. 2011); *Silvan W. v. Briggs*, 309 F. App'x 216, 225 (10th Cir. 2009); *United States v. Finley*, 477 F.3d 250, 258-60 (5th Cir. 2007); *United States v. Martin*, No. 07-20605, 2012 WL 6764800, at *6-7 (E.D. Mich. Nov. 9, 2012); *United States v. Slaton*, No. 5:11-131, 2012 WL 2374241, at *8 (E.D. Ky. June 22, 2012). The Fourth, Fifth, Seventh, and Tenth Circuits have all upheld the search of a cell phone incident to an arrest. *Flores-Lopez*, 670 F.3d at 809-10; *Murphy*, 552 F.3d at 410; *Briggs*, 309 F. App'x at 225; *Finley*, 477 F.3d at 258-60. A number of unreported district court cases in the Ninth Circuit have struck down such searches as a violation of the Fourth Amendment. *See Anthony v. Oliva*, No. ED CV 12-1369-FMO, 2013 WL 1127104, at *7 (C.D. Cal. Jan. 29, 2013); *United States v. Park*, No. CR 05-375 SI, 2007 WL 1521573, at *8-9 (N.D. Cal. May 23, 2007).

In determining the validity of this type of search, courts typically consider the timing and scope of the search into the phone's contents. *See Flores-Lopez*, 670 F.3d at 809-10 (holding the limited search of a cell phone to identify its phone number to be valid because the search was slight and was akin to "a frisk, or the search of a conventional container"); *Finley*, 477 F.3d at 258-60 & n.7 (finding warrantless search of defendant's cell phone records and texts valid because it was incident to arrest and occurred "substantially contemporaneously with his arrest"); *Slaton*, 2012 WL 2374241, at *9 (upholding search of cell phone — including text messages — because the search occurred "at the time and the place of his arrest"). Some courts also consider whether there was any risk that the evidence located in the phone would be destroyed in waiting for a warrant. *See United States v. Santillan*, 571 F. Supp. 2d 1093, 1102-03 (D. Ariz. 2008)(finding search of cell phone incident to arrest proper where there was a risk the call log could be erased by frequent incoming calls); *Park*, 2007 WL 1521573, at *8 (holding search unlawful where the purpose of the officer's search of the phone was purely investigatory and not to prevent destruction of evidence or to ensure the safety of officers or bystanders). *But see Flores-Lopez*, 670 F.3d at 809-10 (finding the search valid despite no real risk of destruction of evidence); *Slaton*, 2012 WL 2374241, at *8 ("[C]ourts have not

required the government to show that the information on the cell phone would actually be deleted or that the defendant was actually capable of deleting the information . . . ." (citing *Murphy*, 552 F.3d at 411)).

The court has found only one case, *United States v. Zavala*, 541 F.3d 562 (5th Cir. 2008), which addresses the search of a cell phone pursuant to an investigatory stop. In *Zavala*, Drug Enforcement Administration ("DEA") agents set up surveillance outside a residence where they suspected drug trafficking activity was taking place. *Id.* at 568. When Zavala arrived at the residence, he had not previously been a suspect of the investigation. *Id.* at 570. The agents observed two other defendants remove unidentified items from a car, place them in a cardboard box, and load the box into a vehicle. *Id.* Zavala accompanied these defendants, but he did not load or otherwise move the boxes. *Id.* Agents also observed one defendant exit a mechanic's shop carrying a pair of pliers, which they suspected were used to open a secret compartment in the vehicle that stored contraband. *Id.* Based on these facts and subpoenaed phone records acquired by the agents in investigating another defendant, the agents pulled over the vehicle and interviewed the three defendants, including Zavala. *Id.* During one agent's questioning of Zavala, he searched Zavala's phone to identify

its phone number and associate it with corresponding subpoenaed phone records. *Id.*

On Zavala's Fourth Amendment challenge to the search of his cell phone, the Fifth Circuit held that the search was conducted pursuant to the investigative stop of the vehicle based on a reasonable suspicion of drug activity — not on probable cause. *Id.* at 568. Though the government argued that the police had probable cause to arrest the defendant at the time his cell phone was searched, the court disagreed. *Id.* at 574. The agent's reasonable suspicion of Zavala did not rise to the level of probable cause because Zavala had not previously been a focus of investigation, no agent recognized him from a prior investigation, his phone number had not been linked to the subpoenaed phone records, and no agent witnessed Zavala participate in the loading or movement of the cardboard box. *Id.* at 575. The court concluded that "[b]ecause [law enforcement] did not have consent or probable cause to arrest Zavala at the time of the search, the search [of Zavala's phone] was unconstitutional." *Id.* at 568. The search was not justifiable under an incident to arrest theory. *Id.* at 576.

3. *Search of Stephens's Phone as Incident to Arrest or Incident to Investigatory Stop*

In the present case, the determinative question is whether the initial investigatory stop of Stephens had become an arrest

based on probable cause at the time Detective Richardson searched Stephens's phone. The facts of this case are similar to the Fifth Circuit *Zavala* case. For instance, at the time that Stephens entered the scene of surveillance at the Dick's Sporting Goods parking lot, he had not previously been the subject of investigation, and the officers did not recognize him. Additionally, law enforcement did not see Stephens actively participate in the exchange of drugs by handling the drugs, getting out of his car, or speaking with the Hispanics who were under investigation.

However, several key facts differentiate Stephens from Zavala and implicate his association with the drug deal under investigation. First, the officers in the present case knew — and not merely suspected — that a drug transaction was underway. They had arranged the reverse sale and knew that a large amount of cocaine was at stake, heightening the risk of the trade and the drug traffickers' need for counter-surveillance. Further, Stephens followed the buyer in the drug transaction to the site of both meeting places and moved in the same unusual patterns throughout the large parking lots as the buyer in the red truck. His deliberate actions placed him in a suspicious light, unlike Zavala's passively accompanying the other defendants. Stephens stopped his car in a position where he could see both meetings, parked in an unusual position that clearly indicated he was not

a shopper at Dick's Sporting Goods, and looked on as the money count and subsequent drug exchange took place. When the police arrived, he attempted to pull away. Finally, all three detectives smelled a strong odor of marijuana and saw a large stash of cash on Stephens's console, further indicating Stephens's connection to drug trafficking and his ability to purchase drugs.[4]

All of these facts — combined with the detectives' information about the circumstances surrounding the drug deal and their experience in recognizing counter-surveillance at drug deals of this scale — differentiate this case from the circumstances in *Zavala* and could possibly have given the officers objective and reasonable grounds for belief that Stephens was guilty of conspiring to traffic drugs based on particularized facts known to them, thus giving them probable cause to arrest him at the scene. *See Ybarra*, 444 U.S. at 91. However, Detective Richardson explicitly testified that Stephens was not under arrest but was merely detained at the time Detective Richardson retrieved Stephens's cell phone and looked at the contact list. Further, Detective Richardson testified

---

[4]   Though Detective McNeal testified that the money on Stephens's console could not have come from the witnessed drug transaction, the officers could reasonably infer that given Stephens's apparent interest in the transaction by being present at the second and third meetings, the money on Stephens's console — amounting to $9,535 — could be used to purchase a portion of the exchanged cocaine.

that after he scrolled through Stephens's cell phone to see if there was any contact between Stephens and the parties detained, "we concluded he was part of the transaction/conspiracy to purchase the cocaine." None of the government's witnesses testified as to when Stephens was actually placed under arrest. Thus, the court concludes that, as in *Zavala*, Stephens was not under arrest at the time of the search of his cell phone, and thus the search of his cell phone is not justifiable as a search incident to arrest and was therefore unconstitutional.

If probable cause to arrest Stephens had existed when he was initially stopped, the search would have been a valid search incident to an arrest based on the timing and scope of the search. *See Flores-Lopez*, 670 F.3d at 804; *Murphy*, 552 F.3d at 411-12; *Briggs*, 309 F. App'x at 225; *Finley*, 477 F.3d at 258-60 & n.7; *Slaton*, 2012 WL 2374241, at *8-9. As to the scope of the search of Stephens's phone, the search remained limited to the contact list. In comparable cases in which law enforcement limited the search of a phone to a contact list, call log, or phone number associated with the phone, courts have considered the privacy interest invaded by this type of intrusion to be slight. *See Flores-Lopez*, 670 F.3d at 805-06, 809-10; *Martin*, 2012 WL 6764800, at *7; *Slaton*, 2012 WL 2374241, at *9. Indeed, several courts have upheld the more intrusive search incident to an arrest of the arrestee's text messages. *See Murphy*, 552 F.3d

at 410; *Finley*, 477 F.3d at 259-60; *Slaton*, 2012 WL 2374241, at *8-9.   The   court   likewise   finds   the   scope   of   Detective Richardson's search into the contact list of Stephens's phone would have been reasonable.

Assuming probable cause to arrest Stephens had existed at the time he was initially stopped, the search of Stephens's phone also occurred at or around the same time of his arrest. Detective Richardson testified that he came on the scene within seconds after Stephens was stopped and looked at his contact list within two minutes of questioning him.   The timing of the search would thus have been contemporaneous with his arrest and was reasonable.   *See Murphy*, 552 F.3d at 412; *Briggs*, 309 F. App'x at 225; *Finley*, 477 F.3d at 260 & n.7.

On the issue of the potential destructibility of evidence, the court finds that there likely was not a risk that the evidence on Stephens's phone would be destroyed in awaiting a warrant.   Once Detective Richardson seized the cell phone, the contact list could not be deleted or altered.   Despite no real risk of destructibility of evidence, the court is persuaded by the Seventh Circuit's reasoning in *Flores-Lopez*:

> [I]n deciding whether a search is properly incident to an
> arrest and therefore does not require a warrant, the courts
> do not conduct a cost-benefit analysis, with the invasion
> of privacy on the cost side and the risk of destruction of
> evidence (or of an assault on the arresting officers) on
> the benefit side of allowing the immediate search.   Toting
> up costs and benefits is not a feasible undertaking to

26

> require of police officers conducting a search incident to
> an arrest.  Thus, even when the risk either to the police
> officers or to the existence of the evidence is negligible,
> the search is allowed, . . . provided it's no more invasive
> than, say, a frisk, or the search of a conventional
> container . . . .

*Flores-Lopez*, 670 F.3d at 809 (internal citations omitted).

Here, as in *Flores-Lopez*, the search into the contents of Stephens's cell phone was minimal, akin to the search of a conventional container.  The lack of risk that content in Stephens's phone could be destroyed in waiting for a warrant would not have rendered the search unreasonable.  *See Slaton*, 2012 WL 237421, at *8 (citing cases where courts have not required the government to show the risk of destructibility of evidence in the cell phone to justify a search incident to an arrest).

While the modern cell phone may carry a greater privacy interest than pagers or other information "containers" of the past, *see Flores-Lopez*, 670 F.3d at 805-06, this court is inclined to follow the four circuits that have upheld the search of a phone incident to an arrest as a reasonable search under the Fourth Amendment.  Given the contemporaneous timing and limited scope of the search at issue here, had Stephens been arrested, the search of his phone would have been a lawful search incident to his arrest.

## III.    RECOMMENDATION

For the reasons expressed above, it is recommended that Stephens's motion to suppress be granted as to the contact list in his cell phone but denied as to the cash.

Respectfully submitted this 9th day of September, 2013.

s/Diane K. Vescovo
DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE
